Approved: _____
EDWARD B. DISKANT/JAMES J. PASTORE JR.
Assistant United States Attorneys

Before:  THE HONORABLE SARAH NETBURN
         United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - - - -X

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **SEALED COMPLAINT** |
| - v. - | : | Violations of 18 U.S.C. § 1349 |
| NASIM MAHMUD, a/k/a "Nesu Nuruddin," TANVEER A. CHAUDHRY, EDNA PAGUD, and PARVEZ MUNSHI, | : : | COUNTY OF OFFENSE: NEW YORK |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - -X

COUNTY OF NEW YORK      )
STATE OF NEW YORK       ) ss.:
SOUTHERN DISTRICT OF NEW YORK )

JOSE CHARRIEZ, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

**COUNT ONE**
(Conspiracy to Commit Bank Fraud)

1.  From at least in or about June 2013, up to and including in or about December 2013, in the Southern District of New York and elsewhere, NASIM MAHMUD, a/k/a "Nesu Nuruddin," TANVEER CHAUDHRY, EDNA PAGUD, and PARVEZ MUNSHI, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit bank fraud in violation of Title 18, United States Code, Section 1344, to wit, MAHMUD, CHAUDHRY, PAGUD, MUNSHI and others conspired to submit fraudulent loan applications to banks in the names of straw borrowers using fake and fraudulent tax returns and other documents

1

in order to trick the banks into extending loans so that MAHMUD, CHAUDHRY, PAGUD, MUHNSI and others could steal the loan proceeds.

2. It was a part and an object of the conspiracy that NASIM MAHMUD, a/k/a "Nesu Nuruddin," TANVEER A. CHAUDHRY, EDNA PAGUD, and PARVEZ MUNSHI, the defendants, and others known and unknown, willfully and knowingly would and did execute and attempt to execute a scheme and artifice to defraud financial institutions, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institutions, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

**OVERT ACTS**

3. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about September 11, 2013, TANVEER A. CHAUDHRY, the defendant, provided false documents and tax returns for EDNA PAGUD, the defendant, and a corporation purportedly controlled by PAGUD to NASIM MAHMUD, a/k/a "Nesu Nuruddin," the defendant, knowing such false documents were to be submitted to a bank for the purpose of obtaining a loan.

b. On or about October 10, 2013, in New York, New York, NASIM MAHMUD, a/k/a "Nesu Nuruddin," the defendant, used the false documents provided by CHAUDHRY, to help complete fraudulent loan applications, knowing such fraudulent applications were to be submitted to a bank for the purpose of obtaining a loan.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge of the foregoing charges are, in part, as follows:

4. I am a Special Agent with the FBI and have been so since 2007. During my time with the FBI, I have investigated numerous cases involving bank fraud, including schemes involving fraudulent mortgages. I have received training in the enforcement of the laws of the United States and in criminal investigations, including the preparation, presentation, and service of criminal complaints, arrest warrants, and search warrants.

5. The information contained in this affidavit is based upon my personal knowledge and my review of documents and records gathered during the course of this investigation, as well as information obtained, directly or indirectly, from other sources and agents, including information provided to me by witnesses who participated in conversations with the defendant. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of the investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## BACKGROUND

6. On or about April 24, 2012, law enforcement agents arrested an individual not named as a defendant herein ("CW-1"). From in or around 2008 until his/her arrest in or around April 2012, CW-1 was a participant in a multi-million dollar mortgage fraud scheme (the "Mortgage Fraud Scheme"). In brief, the scheme involved the use of "straw borrowers" who completed fraudulent home mortgage applications using false paperwork created by other scheme participants which were then submitted to loan brokers and bank employees who were also participating in the scheme and who caused banks to lend money to the straw borrowers in reliance on the fraudulent loan application materials. The scheme participants then stole the loan proceeds.[1]

7. Based on conversations with CW-1, I have learned the following, in substance and in part:

a. Since in or around 2008, CW-1 recruited individuals to participate in the Mortgage Fraud Scheme. Specifically CW-1 recruited straw buyers who were paid to pose as borrowers, as well as accountants and tax preparers who were willing,

---

[1] Shortly after his/her arrest, CW-1 began providing information to law enforcement in the hopes of receiving leniency in connection with CW-1's own prosecution. Information that CW-1 has provided has been corroborated by other information, including, but not limited to, information obtained from documents and records, physical surveillance, recorded calls and conversations, and statements of other cooperating witnesses. On or about April 18, 2013, CW-1 pleaded guilty to charges stemming from his participation in this conspiracy, among other things, pursuant to a cooperation agreement with the Government.

3

frequently in return for cash payments, to create false and fraudulent tax returns, verifications of income, and related documents needed for the straw buyers to obtain financing from various FDIC-insured banks.

    b. Two of the individuals who worked with CW-1 to perpetuate the Mortgage Fraud Scheme were NASIM MAHMUD, a/k/a "Nesu Nuruddin" and TANVEER A. CHAUDHRY, the defendants. For example, MAHMUD recruited "straw borrowers" – i.e., individuals who were willing to allow their names and identities to be used on fraudulent loan applications in return for a cash payment or cut of the fraudulently obtained proceeds.

    c. At all times, MAHMUD, who was paid from the proceeds of the Mortgage Fraud Scheme, understood that the straw borrowers he recruited were being used to help create fraudulent loan applications. Specifically, according to CW-1, MAHMUD was frequently involved in generating the fake documents necessary for the applications and helping to prepare and submit the fraudulent applications to banks.

    d. Similarly, according to CW-1, TANVEER A. CHAUDHRY, the defendant, was one of the tax preparers who, as part of the Mortgage Fraud Scheme, knowingly created false and fraudulent documents in support of the fraudulent loan applications. In particular, CHAUDHRY created "shell corporations" that could be used in furtherance of the Mortgage Fraud Scheme. For example, by naming a straw buyer as the "president" of a shell corporation, CHAUDHRY could create paperwork sufficient for the straw buyer to obtain financing. CHAUDHRY charged a fee for this service, which CW-1 frequently paid in cash.

    e. At all times, CHAUDHRY understood that the false documents were being created in furtherance of a fraudulent loan application and, as such, that the false documents he was creating would be submitted to and relied on by a bank. Specifically, CW-1 and CHAUDHRY frequently discussed the intended use of the fake documents, including the fact that such documents would be submitted to lenders in conjunction with loan applications.

### THE 2013 BANK FRAUD SCHEME

    8. In or about June 2013, following his/her arrest and at the direction of law enforcement, CW-1 contacted NASIM MAHMUD, a/k/a "Nesu Nuruddin," the defendant, by phone regarding potential additional fraudulent schemes. During these Bangladeshi-language

4

phone conversations, which were consensually recorded and have since been translated, in summary fashion, CW-1 explained to MAHMUD that CW-1 had new contacts at one or more banks that could help facilitate new and additional fraudulent loan applications. MAHMUD expressed interest in engaging in such additional fraud and agreed to meet with CW-1 in the near future.

9. On or about July 23, 2013, consistent with the phone conversation described above and at the direction of law enforcement, CW-1 met with NASIM MAHMUD, a/k/a "Nesu Nuruddin," the defendant, at a coffee shop in Queens, New York (the "Coffee Shop"). The meeting was consensually recorded by CW-1. Based on my review of a draft summary translation of that Bangladeshi-language recording, as well as my debriefings of CW-1, I learned the following:

   a. During the meeting, CW-1 and MAHMUD discussed some of the work they had done in the past – i.e., the Mortgage Fraud Scheme described above – as well as some of the other individuals they had worked with. CW-1 reiterated that with the help of a new contact – a loan broker who would be able to help process fraudulent applications – there were new opportunities to engage in additional fraud.

   b. MAHMUD expressed interest in participating and asked CW-1 what would be required to complete the loan applications. CW-1 responded that, just as in the past, MAHMUD would need to recruit straw borrowers willing to allow their names and identities to be used as part of the applications.

   c. CW-1 further indicated that MAHMUD would need fake documents such as tax returns and financial documents in support of the loan applications. MAHMUD indicated that obtaining such documents would not be a problem and that they should ask TANVEER A. CHAUDHRY, the defendant, to create these documents, as both MAHMUD and CW-1 had worked with CHAUDHRY on similar fraud in the past.

   d. MAHMUD and CW-1 also discussed the size of the loans MAHMUD would be able to use straw borrowers to apply for. CW-1 indicated that his broker had connections at multiple banks and that MAHMUD could submit the same fraudulent applications to multiple banks simultaneously, thereby increasing the total amount of loan proceeds – i.e., the total amount of money they could steal from the banks.

10. Between in or around August 12, 2013 and August 20, 2013, CW-1 and NASIM MAHMUD, a/k/a "Nesu Nuruddin," the

5

defendant, spoke several times by phone. During these Bangladeshi-language calls, which were consensually recorded and have since been translated, CW-1 and MAHMUD made plans to meet again to further discuss the potential fraud scheme described above. Specifically, CW-1 indicated that MAHMUD would need to meet with the "broker" to discuss and complete the paperwork for the loan applications.

11. On or about August 21, 2013, at the direction of law enforcement, CW-1 met again with NASIM MAHMUD, a/k/a "Nesu Nuruddin," the defendant, for the purpose of introducing MAHMUD to CW-1's new "broker" who was, in fact, an undercover law enforcement agent posing as a loan broker (the "Broker"). The meeting, which was consensually recorded by CW-1, took place at the "broker's" office which was located in an eatery on Third Avenue in New York, New York (the "Office"). Based on my review of a draft summary translation of that Bangladeshi-language recording, as well as my debriefings of CW-1 and my review of certain documents provided to CW-1 during the meeting, I know the following:

a. During the meeting, CW-1 introduced MAHMUD to the Broker" and told MAHMUD that the Broker was able to process loans at multiple banks.

b. MAHMUD then provided CW-1 and the Broker with identification information for EDNA PAGUD, the defendant, who, according to MAHMUD, was willing to act as a straw borrower as part of a fraudulent loan application. Specifically, MAHMUD provided CW-1 and the Broker with copies of PAGUD's driver's license, social security card and other personally identifying information. MAHMUD also provided copies of identification cards and related information for other individuals, including PARVEZ MUNSHI, the defendant, who, according to MAHMUD, were also available to participate in the scheme as additional straw borrowers.

c. CW-1 and the Broker both indicated that PAGUD appeared to be usable as a straw borrower but that they would still need additional paperwork for PAGUD, namely corporate documents and tax returns to use for the loan application - i.e., documents creating the false appearance of PAGUD's financial soundness and ability to repay the loan.

d. MAHMUD indicated that he would be able to obtain such false documents from an accountant he and CW-1 had worked with in the past, namely TANVEER A. CHAUDHRY, the defendant. MAHMUD further indicated that he would pay CHAUDHRY for his participation

6

in the scheme out of the scheme proceeds.

e. MAHMUD and CW-1 also discussed how the proceeds of the fraudulently obtained loans would be split. According to MAHMUD, 50 percent of the proceeds would go to the straw borrowers – i.e., PAGUD and MUNSHI, among others – while CW-1 and MAHMUD would split the balance, after costs such as paying CHAUDHRY.

12. On or about September 11, 2013, CW-1 met again with NASIM MAHMUD, a/k/a "Nesu Nuruddin," the defendant, as well as TANVEER A. CHAUDHRY, the defendant. The meeting, which took place at CHAUDHRY's office in Queens, New York, was consensually recorded by CW-1. Based on my review of a draft summary translation of that Hindi-language recording, as well as my debriefings of CW-1 and my review of certain documents provided to CW-1 during the meeting, I have learned the following:

a. During the meeting, CHAUDHRY presented MAHMUD and CW-1 with copies of incorporation paperwork for a company called "786 Arc Corp." According to the paperwork provided by CHAUDHRY, EDNA PAGUD, the defendant, – i.e., the straw borrower described above – was listed as "Management" for "786 Arc Corp" which, according to the same paperwork, was a "wholesale clothing" company located at 169-20 Hillside Avenue, Jamaica, New York.

b. CHAUDHRY also presented CW-1 and MAHMUD with fake tax returns that had ostensibly been filed by "786 Arc Corp" for tax years 2011 and 2012 as well as individual returns that had ostensibly been filed by PAGUD for the tax years 2011 and 2012. According to these documents, "786 Arc Corp" had annual gross receipts of nearly $368,000 in 2011 while PAGUD, as "Management," had earned approximately $81,000 in 2011 and nearly $85,000 in 2012.

c. During the meeting, CW-1 and MAHMUD identified certain "problems" with the paperwork – namely, that the paperwork was of low quality and appeared to be missing certain information, such as an "Electronic Identification Number" or "EIN" for the "tax preparer," which would need to be added because, according to CW-1 and MAHMUD, the bank "will be checking."

d. CHAUDHRY indicated that he would "fix" the problems by changing the tax documents – i.e., documents that had ostensibly already been filed in prior years with the IRS — and would then provide CW-1 and MAHMUD with revised versions of the same.

13. On or about September 17, 2013, at the direction

7

of law enforcement, CW-1 met again with NASIM MAHMUD, a/k/a "Nesu Nuruddin," the defendant, at the Coffee Shop. The meeting was consensually recorded by CW-1. Based on my review of a draft summary translation of that Bangladeshi-language recording, as well as my debriefings of CW-1, I know the following:

      a. During the meeting, MAHMUD provided CW-1 with revised fake tax returns and related documents for "786 Arc Corp" and EDNA PAGUD, the defendant, which MAHMUD indicated he had obtained from TANVEER A. CHAUDHRY, the defendant. MAHMUD told CW-1 that CW-1 should provide this revised paperwork to the Broker, so that the Broker could begin work on loan applications in PAGUD's name.

      b. MAHMUD further indicated that he would soon have similar paperwork for one or more additional straw borrowers whose names the Broker could use to complete additional loan applications, but that CW-1 should have the Broker begin work on the application for PAGUD immediately.

      14. On or about September 20, 2013, at the direction of law enforcement, CW-1 met again with NASIM MAHMUD, a/k/a "Nesu Nuruddin," the defendant, at the Coffee Shop. The meeting was consensually recorded by CW-1. Based on my review of a draft summary translation of that Bangladeshi-language recording, as well as my debriefings of CW-1 and my review of certain paperwork provided to CW-1 during the meeting, I know the following:

      a. During the meeting, MAHMUD provided CW-1 with the name of PARVEZ MUNSHI, the defendant, whom MAHMUD identified as another straw borrower whose identity could be used to complete additional fraudulent loan applications. MAHMUD also provided CW-1 with certain personal identification information for MUNSHI and copies of fake tax returns for a corporation ostensibly controlled by MUNSHI which MAHMUD indicated had been prepared by TANVEER A. CHAUDHRY, the defendant.

      b. According to this paperwork, MUNSHI was "Management" for "Bedford Fast Food Shop," a "wholesale food supplies" company located at 169-20 Hillside Avenue, Jamaica, New York – i.e., the same address at which the company purportedly managed by EDNA PAGUD, the defendant, "786 Arc Corp," was ostensibly located. The accompanying tax documents indicated that "Bedford Fast Food Shop" had gross receipts in 2012 of approximately $376,000, while MUNSHI had earned approximately $85,500 in 2012 as its "President."

      c. The tax paperwork which, as noted, MAHMUD

8

indicated was prepared by CHAUDHRY, also bore the name of the same purported "tax preparer" as the paperwork prepared for PAGUD - an individual with a name other than "Tanveer A. Chaudhrey" ("Tax Preparer-1").

        d.    CW-1 indicated that he would provide this additional paperwork to the Broker so that additional loans could be applied for in the name of MUNSHI.

        15.    On or about October 4, 2013, at the direction of law enforcement, CW-1 met with NASIM MAHMUD, a/k/a "Nesu Nuruddin," the defendant at the Coffee Shop. The meeting was consensually recorded by CW-1. Based on my review of a draft summary transcript of that Bangladeshi-language recording, as well as my debriefings of CW-1 and my review of certain documents provided to CW-1 during the meeting, I know the following:

        a.    During the meeting, MAHMUD provided CW-1 with certain additional paperwork for EDNA PAGUD and PARVEZ MUNSHI, the defendants, including what appeared to be bank records for accounts held by PAGUD and MUNSHI.

        b.    According to these purported bank records, PAGUD and MUNSHI both appeared to have substantial assets consistent with their corporate leadership positions as reflected in the paperwork generated by TANVEER A. CHAUDHRY, the defendant. For example, according to these purported bank records, PAGUD appeared to have a cash balance of approximately $93,500 in her account, while MUNSHI appeared to have a cash balance of approximately $70,450.

        c.    CW-1 promised to provide this new paperwork to the Broker and further indicated that MAHMUD would need to arrange for PAGUD and MUNSHI to meet with the Broker in person, as the Broker would need PAGUD and MUNSHI to sign the loan applications being prepared in their names.

        16.    On or about October 10, 2013, at the direction of law enforcement, CW-1 met again with NASIM MAHMUD, a/k/a "Nesu Nuruddin," the defendant. Consistent with the conversation described in paragraph 15, above, the meeting occurred at the Broker's Office in New York, New York. Based on my review of that English-language recording, as well as my debriefings of CW-1, I know the following:

        a.    During the meeting, MAHMUD was joined by individuals who identified themselves as EDNA PAGUD and PARVEZ

MUNSHI, the defendants, whom MAHMUD introduced to CW-1 and the Broker.

   b. The Broker then presented PAGUD and MUHNSI with commercial loan applications in each of their names. Specifically, the Broker provided PAGUD and MUHNSI each with applications for commercial loans from Wells Fargo and Sovereign bank. The Broker then began to review the information contained in the applications with PAGUD and MUNSHI, information such as the names of the corporations PAGUD and MUNSHI ostensibly controlled as well as each defendant's purported contact and financial information - i.e., information, which as detailed further in paragraph 18 below, is false.

   c. PAGUD then signed, in the Broker's presence, two completed loan applications - an application for a $230,000 commercial loan from Sovereign Bank, and an application for a $230,000 commercial loan from Wells Fargo Bank - both in the name of "786 Arc Corp." PAGUD signed both as the "President" of "786 Arc Corp."

   d. Both of the applications signed by PAGUD included all of the information - including purported earnings information - from the paperwork provided by TANVEER A. CHAUDHRY, the defendant, as described in paragraph 12, above. Both applications also included copies of that paperwork as well as the purported bank records ostensibly showing more than $90,000 in PAGUD's account which were provided to CW-1 by MAHMUD as described in paragraph 15, above.

   e. Similarly, MUHNSI helped to complete and then sign, in the Broker's presence, two loan applications - an application for a $230,000 commercial loan from Sovereign Bank, and an application for a $230,000 commercial loan from Wells Fargo Bank - both in the name of "Bedford Fast Food Corp." MUHSNI signed both as the "President" of "Bedford Fast Food Corp."

   f. Both of the applications signed by MUNSHI included all of the information - including purported earnings information - from the paperwork provided by CHAUDHRY as described in paragraph 12, above. Both applications also included copies of that paperwork as well as the purported bank records ostensibly showing nearly $70,000 in MUNSHI's account which were provided to CW-1 by MAHMUD as described in paragraph 15, above.

   17. On or about November 4, 2013, at the direction

10

of law enforcement, CW-1 met again with NASIM MAHMUD, a/k/a "Nesu Nuruddin," the defendant. The meeting was consensually recorded by CW-1. Based on my review of a draft summary translation of that Bangladeshi-language recording, as well as my debriefings of CW-1 and my review of certain paperwork provided to CW-1 during the meeting, I know the following:

   a. During the meeting, MAHMUD provided CW-1 with certain additional paperwork regarding the loan applications described above.

   b. MAHMUD and CW-1 also discussed how MAHMUD would collect the money after the loans were approved. Specifically, MAHMUD provided CW-1 with a blank check bearing a Capital One account number ending in 4870 (the "Capital One Account") and directed CW-1 to have the funds from the various loans wired to this account after they were approved.

   18. Based on my review of the paperwork provided by TANVEER A. CHAUDHRY, the defendant, in the names of EDNA PAGUD and PARVEZ MUHNSI, the defendants, and then used by NASIM MAHMUD, a/k/a "Nesu Nuruddin," the defendant, in support of the various loan applications described in paragraph 16, above, as well as my review of law enforcement databases, public records, bank records, and surveillance conducted by myself and other law enforcement agents, I know that the paperwork described above is false and fraudulent. Specifically, I know the following:

   a. There is no "786 Arc Corp" located at 169-20 Hillside Avenue, Jamaica, New York. Based on a routine law enforcement visit to that location, I know that there are only two businesses located at that address, neither of which is "786 Arc Corp." I further know, based on conversations with an employee at location, that no other corporations are located at, or associated with, that address.

   b. Similarly, based on a review of law enforcement databases, I know that PAGUD - ostensibly the "President" of "786 Arc Corp" - is also not associated with that address in any public or law enforcement records.

   c. Moreover, much if not all of the financial information for PAGUD appears to be fabricated. For example, PAGUD did not have nearly $90,000 in her bank account, as the purported bank records included with her loan applications would indicate. Instead, PAGUD's actual bank records indicate that PAGUD appears to

11

have had approximately $177 in her bank account during the time period covered by the fraudulent paperwork in question.

   d. Similarly, there is no "Bedford Fast Food Corp." located at 169-20 Hillside Avenue, Jamaica, New York, nor is MUNSHI, the "President" of "Bedford Fast Food Corp," associated with that address.

   e. Moreover, much if not all of the financial information for ~~PAGUD~~ MUNSHI jr appears to be fabricated. For example, MUNSHI did not have nearly $70,000 in his bank account, as the purported bank records included with her loan applications would indicate. Instead, MUNSHI's actual bank records indicate that MUNSHI appears to have had approximately $2,700 in his bank account during the time period covered by the fraudulent paperwork in question.

  WHEREFORE, deponent respectfully requests that a warrant issue for the arrest of NASIM MAHMUD, a/k/a "Nesu Nuruddin," TANVEER A. CHAUDHRY, EDNA PAGUD, and PARVEZ MUNSHI, the defendants, and that he be arrested and imprisoned, or bailed, as the case may be.

_____
JOSE CHARRIEZ
SPECIAL AGENT
FBI

Sworn to before me this
\_\_ day of January 2014

_____
HON. SARAH NETBURN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK